Pollock, J.
On December 18, 1915, A. Schultz & Company, a partnership, were engag'ed in conducting a general store near one of the coal mines of Guernsey county. On the evening or night of that day the building in which they were conducting this store took fire, and the stock of goods contained therein was totally destroyed. At the time of the fire The Old Colony Insurance Company, The Columbiana County Mutual Insurance Company, The Firemen’s Insurance Company, The Richland County Mutual Insurance Company, and The Knox Count}?- Mutual Insurance Company, each had issued a policy of insurance in the amount of $1,000, indemnifying A. Schultz & Company against loss of their stock of goods by fire.
After the loss of this property the insurance companies refused to pay the aiiiount of indemnity provided in their policies, and separate suits were brought in the court below by this partnership against the various companies. A jury was waived, the cases were submitted to the court, and judgment was rendered in favor of the insured and against each defendant company. Each of these insurance companies is prosecuting a separate action in error in this court to reverse the judgment against it for errors which it claims occurred in the trial and judgment of the court 'below. The same question is involved in each of *471 these cases, which were submitted to this court together and will be so disposed of.
All of these policies contain what is known as' the “iron-safe clause,” and the question to be determined requires a construction of that clause.
The insured had been for some years prior to this time conducting- both a general dry goods store and a grocery store in the building that was destroyed. They had kept their property insured from the time they began business. Some of the companies, whose policies are involved in this suit, first insured the stock of goods of this partnership in the fall of 1911. Each policy was ■drawn for one year, and at the end of the year a renewal policy was issued by each company, and defendants below do not deny’that at the time of this fire they had policies covering- the stock of goods. This “iron-safe clause” reads as follows:
“Iron-Safe Clause. The assured under this policy hereby covenants and agrees to take an inventory, of the stock hereby covered, at least once every twelve months during the life of this policy, and unless such inventory has been taken within one year prior to the date of this policy, one shall be taken in detail within thirty days thereafter, and to keep a set of books showing a complete record of business transacted including- all purchases and sales both for cash and credit, together with the last inventory of said business, and further covenants and agrees to keep such books and inventory securely locked in a fireproof safe at night, and at times when the store mentioned in the within policy is not actually open for business, or in some secure place, not exposed to a fire *472 which would destroy the house where such business is carried on; and in case of loss the assured agrees and covenants to produce such books and last inventory, and in the event of a failure to produce the same, this Policy shall be deemed null and void, and no suit or action at law shall be maintained thereon for any such loss.”
The testimony in regard to- the compliance with •the provisions of these policies — and we might say there is substantially no 'conflict of any kind in the testimony — showed that during the life of these policies A. Schultz & Company had made an inventory, as required by the policies, about the first of January of each year, and that the last invem tory ¡was made in January prior to the fire. That inventory was recorded in a book which the insured -called the ledger. The bills showing the purchase of goods after the inventory was taken, and the prices paid -therefor, were also entered in this book. The insured also testified that they kept a record showing the cash sales and the sales on credit, and that these books were kept in the store during the time it was open for business. They ¡did not have a safe in the store, and their custom was to place the books in an oilcloth cover- and for one of the partnérs to take the books to his house at night. .Sometimes on very stormy nights the partners would sleep in the store. They testified that on such occasions the books were la-id on a chair near the bed on which they slept.
On the evening- of this fire they closed the store about six o’clock. It was raining and very dark •and the roads were very muddy. A. Schultz, who -seems to have had the general charge of the books, *473 says 'that he wrapped the books in the ordinary way and started out of the store to go home; intending to walk to the street car line. After learning the condition of the evening he turned and went back into the store - and handed the books to ■a man named Callihan, -one of their clerks, -and told him to put them in the wagon' in which he, Callihan, and one of the partners were going to ride to the city. Callihan and the other partner were taking some groceries, in the wagon to deliver to customers on their road home. Callihan testifies that he laid the books on the counter near the door, then went and got some groceries which he was to deliver and placed the groceries in the wagon. He testifies that he thought he took the books from the counter where he had laid them and placed them in the .wagon; but, without -doubt, he did not do this, and the books were left in the store where Callihan had laid them, and were destroyed by the fire.
It must be conceded that this- was a violation of the terms of the contract of insurance. These books of account, when the store was closed, were either to be kept in a fireproof safe or taken away from the building, in order that they would not be destroyed in -case the building was burned.
It is earnestly urged by the insurance company that the mere fact that the books were within the building when the store was not open for business, and were thus destroyed by fire, prevents a recovery, regardless of it being an inadvertent or forgetful act; while the insured urge that they have substantially complied with the provisions of the policies of insurance and that their indemnity *474 under the policies should not be forfeited by reason of the, unintentional act of this young man.
The act of Callihan was the act of the insured. He was in their employ. They placed their "books in his care and are bound by his act as much so as if one of the partners had left the books in the store.
Questions growing out of the construction and performance of the “iron-safe clause” in a fire insurance policy have been before the courts of this country many times, but it would no't be profitable to attempt to consider all of the cases, much less to undertake to harmonize all the holdings of the courts.
Among other cases, the plaintiffs in error have called our attention to the case of Allred v. Hartford Fire Ins. Co. (Tex. Civ.), 37 S. W. Rep., 95, which was an action on a policy of insurance containing the “iron-safe clause,” on a stock of goods where the insured had complied with- the provisions of that clause of the policy by keeping the necessary books, but through inadvertence the books had not been placed in the safe and were -destroyed by a fire which burned the buildings and the stock of goods. Held, that there was a breach of the warranty by the insured and that he could not recover.
To the same effect is the case of Goldman v. North British Mercantile Ins. Co., 48 La. An., 223, 19 So. Rep., 132.
The holding in these cases is based on the principle that this provision in the insurance clause is a warranty, and must be strictly complied with by the insured in order to authorize a recovery. *475 The facts in each of these ca,ses are quite similar to the facts in the case which we are now considering.
The insured have called our attention, among other cases, to that of The Connecticut Fire Ins. Co. v. Jeary, 60 Neb., 338, 83 N. W. Rep., 78, where it was held that the provisions of the “iron-safe clause” in a policy of insurance “should be construed conjointly, and that, to work a forfeiture of the policy, there must be a failure to perform all the conditions named, and not any particular one of them.”
And, again, to the case of Western Assurance Co. v. McGlathery, 115 Ala., 213, 223, 22 So. Rep., 104, 108, where it was said that this clause “has received a fair, reasonable interpretation, so that it may not work forfeitures, or defeat the claim of the innocent insured to the indemnity promised by the policy.”
The wide variance in the decisions of the several courts in the many actions growing out of this clause in insurance policies results from the different views taken of it by the courts; those requiring strict compliance with the provisions of this clause, in order to recover, construe this provision ' as a warranty, while those placing upon it a liberal construction construe it as a condition subsequent whose enforcement would work a forfeiture of the indemnity named in the policy, otherwise payable.
No doubt can exist but that the supreme court of this state in the several cases which have come before it containing conditions which would work a forfeiture has followed the latter rule. In the *476 case of West et al. v. Citizens’ Ins. Co., 27 Ohio St, 1, on page 10, of the opinion the court said:
“None of these rules is more fully established or more imperative and controlling than that which declares that it must be liberally construed in favor of the insured, so as not to defeat, without a plain necessity, his claim to indemnity, which, in making his insurance, it was his object to secure; and when the words ‘without violence’ are susceptible of two interpretations, _ that which will sustain the claim and cover the loss must in preference be adopted.”
And again the court said in Union Cent. Life Ins. Co. v. Pottker, 33 Ohio St., 459, “forfeitures, are odious.”
In the opinion in Webster et al. v. Dwelling House Ins. Co., 53 Ohio St., 558, Spear, J., said at page 563:
“ * * * forfeiture lis a deprivation or destruction of a right 'in consequence of the non-performance of some obligation or condition * * *.
“A primal rule is that forfeitures are not favored either in equity or at law; indeed, it is declared as a universal rule that courts of equity will not lend their aid to enforce a forfeiture. Following as a corollary from this, provisions for forfeitures are to receive, when the intent is doubtful, a strict construction against those for whose benefit they are introduced.”
In the syllabus of this case, the court said:
“Rules followed in courts of equity respecting forfeitures may be available in a suit at law where the facts make their application necessary to the ends of justice.”
*477 Other cases might be cited from the courts of this state to the same effect, but the above are sufficient. *
It should be said that the eases in which the ■courts of this state 'have construed conditions in a policy of insurance, the enforcement of which would work a forfeiture, were mostly cases construing the words or language of the clause of the policy under consideration, and not the acts of 'the insured in complying with that condition of the policy, but we think that if a liberal construction in favor of the insured should be placed upon the language of the policy, in order to avoid a forfeiture, the same construction should be applied to the acts of the insured in complying with the provisions of the policy.
This act of the young man in leaving the books in the store, whether you call it forgetfulness or inattention, was an- unintentional negligent act. He left the books in the store unintentionally, but they were left there and destroyed and this provision of the policy was violated by that act.
The question of the effect upon the insured of a negligent violation of the provisions of this clause in an insurance policy was before the federal court of appeals in the case of Liverpool & London & Globe Ins. Co. v. Kearney, 94 Fed. Rep., 314, and the court said:
“ * * * it requires the insured to produce them after the fire, if within his power to do so, and casts upon 'him the responsibility for their loss in all cases where such loss is due to a wrongful or fraudulent act on 'his part, or to his culpable neohqence.”
*478 The same case came before the supreme court of the United States (180 U. S., 131), and that court 'said at page 138:
“Failure [of an insured] to produce the books * * * means a failure to produce them if they are in existence when called for, or if they have been lost or destroyed by the fault, negligence or design of the insured.”
No doubt the failure to produce the books required by the “iron-safe” provisions of the policy may work a forfeiture of the indemnity in the policy even though such failure is caused by the unintentional negligence of the insured, if such act affects substantially the rights of the insurer under the contract. In this case the insured did not produce the books required to be kept by this provision of the policy for the inspection of the insurer. Whether this was such a failure to perform the conditions of the contract of insurance as would work a forfeiture in the indemnity of the policy depends upon whether the failure was excusable or inexcusable.
The one question then to be determined is whether leaving the books in the store on the night of the fire, under the circumstances in which they were left, and their destruction as a result of that act, prevents a recovery on the policy. The consequence of an unintentional negligent act is never inflicted upon the negligent party for the mere purpose of enforcing a penalty or forfeiture, but only to recompense some one who has. suffered by reason of that act. If by the unintentional negligent act of one party to a contract the other contracting party has lost a substantial legal right *479 •under the contract, the party who has been guilty ■of negligence should lose the benefit of the contract rather than the other party, but if on the other hand the other contracting party has not been deprived of any substantial contract right by reason of such negligence he should not be permitted to stand on his technical rights under the contract in order to defeat the negligent party of his beneficial interest in the contract.
This provision in the insurance policy was inserted for the benefit of the insurance company that it might have a better or more accurate way of ascertaining the amount of loss suffered by the insured in case of fire, and the amount the company ■would be required to pay under its policy. That was a contract right which the insurer had under the conditions of the policy, and if by this uninten•tional negligent act of the insured it has substantially lost the means of determining the value of the insured property destroyed by the fire the insured must suffer the loss of the indemnity in the policy^-; but, on the other hand, if, notwithstanding the loss of these books by the negligence of the insured, the insured is able to produce substantially the same proof that would have been available to the insurer had the books been preserved, the insurance company ought not to be permitted to stand upon the technical performance of this condition of the policy in order to defeat the recovery of the indemnity provided for in the policy.
What do the facts show in this case?
The insured 'had the original pencil copy of the last inventory, and produced it, which, so far as *480 an inventory is concerned, was a compliance «with the provisions of this clause. The insured was required to keep an account of its purchases from the time of the making of the inventory down to the time of the fire. The testimony shows that it' did keep this in the same book that it recorded the inventory, but this book was destroyed by fire. The original bills of its purchases were also destroyed by this fire. But it secured duplicates from the wholesale houses from which it purchased, and produced the duplicates at the trial. These duplicate bills would furnish the insurance company as much information and would enable it to trace their reliability just as readily as though •they were the original bills, or the entries in the book.
The insured wa's also required to keep a cash account and an account of its credit sales. The only evidence of the cash account that the insured could produce was the pass book between the partnership and the bank with which it did business. We have examined this book, and it seems that deposits were not made on every day; but they were made in fairly regular order, and only a day or two intervened between entries of deposit. .If the partnership liad kept a personal book, and had noted in it the cash accounts, just as they are noted in this 'book, and had produced that book, it would have been a compliance with the provisions of the policy. We are unable to see why the pass book, with the amounts noted by the bank, would not be as reliable as a book képt by the partnership.
*481 It is further urged that this book should not be accepted in lieu of the one required by the policy, for the reason that the insured had intermingled with the deposits from the sale of goods covered by the policy funds received from the sale of goods not covered by the insurance. The insured could not receive any advantage from the intermingling of 'these funds; but, counting all of the deposits shown by 'this book as cash sales of the goods covered by 'the policy, it would not reduce the loss of the insured, as shown by the testimony, below the amount of the insurance, and the insurance companies would still be required to pay the total amount of their policies.
We come next to the requirement that the insured was to keep an account of its credit sales. These were kept, but destroyed by the fire. The insured in conducting its store issued pass books 'to its credit customers. After the fire the insured examined these pass books in the hands of its ■customers to determine the amount of its credit sales. The insured could, and would, have produced these books for the inspection and examination of the insurers had they so desired, or had they been willing to accept them as proof of the credit sales.
We think that if the insurers, when they learned of the destruction of the books, instead of refusing to pay the policies, had made a reasonable effort to 'examine the inventory and accounts which the insured could and would have produced for their inspection and examination, they could have.determined, as accurately as if they had the book’s, the loss which the insured sustained. From the record *482 in this case we have no doubt that the value of the property insured by the plaintiffs in error, and which was destroyed by the fire, largely exceeded the indemnity in the policies. There is no indication that the fire was the result of the wrongful aot of the insured. It would be an injustice to the insured to enforce a forfeiture of the indemnity provided by these policies by reason of the unintentional negligence of the insured, when the insurer did not lose .thereby any substantial means of determining the amount of the loss of the insured.
Judgment of the court below is affirmed in all the cases.

Judgments affirmed.

Metcalfe and Farr, JJ., concur.